# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. CR410-260 |
| ) | |
| DAMIEN ARMEAD GAINES ) | |

## REPORT AND RECOMMENDATION

Defendant Damien Gaines moves to suppress a firearm seized following a traffic stop on the night of August 5, 2010. (Doc. 15.) At an evidentiary hearing the Court heard from Savannah-Chatham Metropolitan Police Department ("SCMPD") Detectives James Hutcherson, Nick Gorgas, and Amy Wilson, as well as Officer Brian Krouse. Gaines' brother testified on his behalf. For the reasons that follow, the motion to suppress should be denied.

## I. BACKGROUND

On the evening of August 5, 2010, Detective Hutcherson, a member of a TRAP unit assigned to investigate narcotics and other forms of vice, was conducting surveillance in an unmarked vehicle near 31st and Le

Grand Streets, a high crime area in Savannah, Georgia. At around 10:00 p.m., he focused on a distinctive bright yellow Chevrolet Malibu that was painted like a Kellogg's Sugar Pops cereal box, complete with a listing of the product's nutritional information. Hutcherson, who had seen the car in the area before, noted that the vehicle had parked in front of a "known drug location" and watched as the driver exited his vehicle and interacted with some individuals already at the residence. When the Malibu departed, Hutcherson stayed at his post but radioed local marked units "to get an eye" on the car.

Officer (now Detective) Gorgas and Officer Krouse, who were patrolling the area in a marked patrol car as members of the Neighborhood Task Force, responded to the call and began to tail the Malibu. After observing the driver fail to give a turn signal as he made a left turn, Gorgas activated his emergency lights. The Malibu was slow to respond to the blue lights, drove past several ideal spaces for pulling over, and eventually stopped in the right-hand lane of traffic on Price Street.

Officer Gorgas approached the driver, defendant Gaines, and informed him of the reason for the stop. He secured Gaines' driver's

license and his passenger's identification. While Officer Krouse took up a position on the passenger side of the car, Gorgas returned to his patrol car and performed a records check using his car's on-board "mobile data terminal." The computer check, which took only some two-and-a-half to three minutes, revealed that Gaines was then on parole but reflected no active warrants on either Gaines or his passenger. After learning that Gaines was a parolee, Officer Gorgas approached him again momentarily and sought his consent to search the Malibu. Gaines refused, asking why a search was even necessary since he was stopped for a mere turn signal violation. Gorgas broke off the conversation and returned to his vehicle to issue Gaines a traffic citation. As he passed Officer Krouse, Gorgas mentioned that he was going to call for a drug dog.[1] Officer Krouse stepped over to the driver's side door as Gorgas wrote out the citation.

---

[1] Jamel Gaines, defendant's brother and passenger, testified that the officers threatened to call a drug dog and that Officer Krouse reached in through the driver's side window to seize the car keys due to their refusal to consent to the search. Jamel Gaines is a felon, and his testimony was halting, unclear, and unreliable. His obvious bias, plus his general demeanor at the hearing, causes the Court to reject his version of the facts. The Court instead credits the factual recitation of the arresting officers, who gave consistent and believable accounts of the events.

Officer Williams, who had arrived as backup, took position at the passenger door.

While Gorgas was filling out the citation, Gaines exited his vehicle, began to fight with Officer Krouse (who was punched in the face), and fled the scene. Gorgas and Williams pursued him, but Gaines ultimately managed to leap a large privacy fence and got away. Meanwhile, Officer Krouse had taken control of the passenger. Given Gaines' flight, Gorgas and Williams had separately concluded that, based on SCMPD policy, they were going to tow the car that Gaines had abandoned. Savannah police policy required that the vehicle be inventoried before it was towed. (Gov't Ex. 1 at 4-12.) Before commencing the inventory, however, Officer Williams noticed through the open driver's door[2] that there was a pistol with an extended magazine underneath the driver's seat. She spotted the pistol while standing between the car door and the cabin but without having entered into the vehicle. Gaines is charged with possessing that

---

[2] Jamel Gaines testified that he exited the vehicle through the driver's side door to assist his brother, closing the door on the way out. The Court, however, credits the officers' testimony that defendant left the driver's door open when he exited the vehicle and that it remained open throughout the rest of the encounter.

4

gun while a convicted felon. Williams searched the rest of the vehicle but found nothing else of interest.

## II. ANALYSIS

Defendant concedes that the initial stop was supported by probable cause.[3] (Doc. 17 at 1.) He contends, however, that the warrantless search of the vehicle violated his Fourth Amendment rights. (Docs. 15 & 17.) He is mistaken.

The Court notes as an initial matter that Gaines was not, as he suggests in his brief and affidavit, detained for an unreasonable period of time while the officers awaited the arrival of a drug dog. It is true that absent reasonable suspicion or the motorist's consent, a traffic stop can last no "'longer than necessary to process the traffic violation.'" *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999) (quoting *United States v. Holloman*, 113 F.3d 192, 196 (11th Cir. 1997)). In keeping with

---

[3] While defendant never suggested that the stop was invalid, the Court notes that it matters not that the officers had an interest in him apart from enforcing Georgia's traffic code. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996); *id.* at 811 (rejecting "the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause"); *Riley v. City of Montgomery*, 104 F.3d 1247, 1252 (11th Cir. 1997) (holding that constitutional reasonableness is determined irrespective of the intent of an individual officer or theoretical "reasonable officer").

that rule, an officer cannot unreasonably prolong a stop simply to secure the presence of a drug dog. *United States v. Boyce*, 351 F.3d 1102, 1110 (11th Cir. 2003). In every traffic stop, however, an officer may not only conduct a routine check of the motorist's driver's license and vehicle registration but also run a criminal history check. *United States v. Purcell*, 236 F.3d 1274, 1278-79 (11th Cir. 2001) (citing *Delaware v. Prouse*, 440 U.S. 648, 657-59 (1979)). And an officer may call for a drug detection dog to be brought to the scene, so long as the seizure is not "prolonged beyond the time reasonably required to" issue a traffic citation. *Illinois v. Caballes*, 543 U.S. 405, 407-408 (2005) (holding that a dog sniff of a vehicle does not infringe a person's constitutionally protected interest in privacy and therefore does not change the character of a traffic stop that is "lawful at its inception and otherwise executed in a reasonable manner").

Courts considering whether the duration of a stop is constitutional examine the time that elapsed between the initial stop and the point at which the officer obtained consent or other justification for the search. *See Purcell*, 236 F.3d at 1279; *United States v. Hernandez*, 418 F.3d 1206,

1210 (11th Cir. 2005). Here, Gaines fled before the officer could even finish writing the citation. There is no evidence in the record suggesting that the officer was delaying the issuance of the citation in order to secure the presence of a drug dog. Indeed, the undisputed testimony establishes that only ten to fifteen minutes passed between the time of the stop and Gaines' assault of Krouse and subsequent flight. The Eleventh Circuit has suggested that such a short detention is *presumptively* reasonable, and Gaines has not offered any evidence countering that presumption other than his conclusory suggestion that the stop was "unreasonably prolonged." *Hernandez*, 418 F.3d at 1212 n.7 ("Where at its inception, a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the duration is too short."). Gaines' flight terminated the encounter long before the detention might have become unreasonably delayed.

Since there was no illegality arising from the brief detention, Gaines forfeited any reasonable expectation of privacy with respect to the vehicle and its contents by fleeing from the police officers and abandoning his car.

*United States v. Williams*, 569 F.2d 823, 828 (5th Cir. 1978) (truck driver abandoned his trailer and relinquished his expectation of privacy in its contents when, after learning he was being followed by the police, he pulled into a rest area, unhooked the trailer, and left); *Edwards v. United States*, 441 F.2d 749, 751 (5th Cir. 1971) (motorist relinquished his privacy rights in vehicle when, after a high speed chase, he "abandoned his car . . . on a public highway, with engine running, keys in the ignition, lights on, and fled on foot"); *see United States v. Washington*, 12 F.3d 1128, 1132-33 (D.C. Cir. 1994) (defendant abandoned vehicle after he overturned it in an alley and fled the scene following a high speed chase). Hence, the Court is satisfied that defendant lacks "standing" to contest the gun's seizure.[4] *E.g., United States v. Jefferson*, 2010 WL 3928049 at *8-9 (N.D. Ga. May 25, 2010); *United States v. Tilson*, No. CR405-290, doc. 40 at 6-7 (S.D. Ga. Jan. 31, 2006) ("A speeding motorist who crashes his vehicle into a guard rail and who flees on foot from an approaching police officer cannot complain when the police conduct a warrantless search of the abandoned vehicle.").

---

[4] Defendant has not presented any authority suggesting that the presence of a passenger undermines such a result.

Even if Gaines retained a privacy expectation in his vehicle following his flight, his claim fails. As an initial matter, Officer Williams' pre-inventory observation of the pistol from outside of the vehicle did not even amount to a search. "Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has a right to be in close proximity to the vehicle." *United States v. Bynum*, 508 F.3d 1134, 1137 (8th Cir. 2007); *see Texas v. Brown*, 460 U.S. 730, 739-40 (1983) (plurality) (it is "beyond dispute" that shining a flashlight to illuminate the interior of a car trenches upon no right secured under the Fourth Amendment); *United States v. Desir*, 257 F.3d 1233, 1236 (11th Cir. 2001) (crack cocaine observed in "plain view" when officer shined his flashlight through window of car); *United States v. Willis*, 37 F.3d 313, 316-17 (7th Cir. 1994) (police officer was permitted not only to look through open car door, but to use a flashlight and crouch on the ground alongside to get a better view); *see also United States v. Dunn*, 480 U.S. 294, 304-05 (1987) (officers' use of flashlight to illuminate interior of barn did not constitute a "search"); *United States v. Elkins*, 300 F.3d 638, 652-56 (6th Cir. 2002) (holding that

an officer may peer through gap around a pipe leading into a building and any physical "contortions" the officer made to obtain the view "did not change the 'plain view' character of the observation"). These officers had every right to be in close proximity to a vehicle that had been lawfully stopped for a traffic violation, particularly when the driver of the vehicle had just assaulted an officer and fled the scene. Before commencing an inventory of the abandoned vehicle, Officer Williams spotted a pistol protruding from underneath the driver's seat. She made this observation while standing between the passenger compartment and the vehicle's open door, without leaning into the vehicle. Thus, even if Gaines had standing, this "plain view" observation did not violate his Fourth Amendment rights. Upon discovering the firearm, Williams had the right to seize it, since its incriminating nature was immediately apparent; given defendant's status as a parolee, she had probable cause to believe that the gun was illegally possessed. *See United States v. Smith*, 459 F.3d 1276, 1290-91 (11th Cir. 2006) (the "plain view" doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and (2) the incriminating character

of the item is immediately apparent). Alternatively, it was proper for her to seize it under her community caretaking function. *See Cady v. Dombrowski*, 413 U.S. 423, 441 (1973) (police often have occasion to enter, and even search, vehicles for reasons "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute"); *United States v. Miller*, 589 F.2d 1117, 1125 (1st Cir. 1978).

Finally, even if Gaines has standing and the plain view doctrine is inapplicable, his claim *still* fails, for Officer Williams had authority to search defendant's car pursuant to the police department's inventory policy. It is well settled that police officers may conduct inventory searches of vehicles lawfully in their custody provided the inventory is conducted pursuant to standardized government procedures. *Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991). After Gaines had abandoned his vehicle, the officers determined that the car would be towed, as the driver (and registered owner) of the vehicle had fled the scene, the vehicle was blocking one of the lanes of travel on Price Street, and no one else was

authorized to remove the abandoned vehicle.[5] The decision to tow the vehicle required that it be inventoried. (Gov't Ex. 1 at 9-10 (SCMPD Towing Policy § XI).)

## III. CONCLUSION

For the various reasons explained above, defendant's motion to suppress (doc. 15) is without merit and should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this __19th__ day of January, 2011.

_/s/ GRS_
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT of GEORGIA

---

[5] Defendant's counsel suggested at the hearing that defendant's brother should have been permitted to assume control over the vehicle, thereby making an inventory search unnecessary. SCMPD policy, however, permits the police to release a vehicle only to a person "authorized by the vehicle owner to take control of the vehicle." (Gov't Ex. 1 at 7 (SCMPD Towing Policy § IV); see id. at 11 (allowing release of an impounded vehicle to a family member only if "the prescribed owner approves of releasing the vehicle to them").) It is undisputed that defendant never authorized the police to release his vehicle to his brother. Nor did defendant testify that he even wanted the vehicle released to his brother.